328 So.2d 1 (1976)
Larry THOMPSON, a/K/a Mark A. Lewis, Appellant,
v.
STATE of Florida, Appellee.
No. 45107.
Supreme Court of Florida.
January 21, 1976.
Rehearing Denied March 23, 1976.
*2 Richard L. Jorandby, Public Defender, and Kenneth J. Scherer and H. Joseph McGuire, Asst. Public Defenders, for appellant.
Robert L. Shevin, Atty. Gen., and Michael M. Corin, Asst. Atty. Gen., for appellee.
PER CURIAM.
The defendant, Larry Thompson, a/k/a Mark Anthony Lewis, 17 years of age, was indicted for first degree murder of Richard Dean. He was tried before a jury and found guilty as charged. On the same day, the jury was recalled to consider matters of aggravation and mitigation and to render an advisory opinion as to the sentence to be imposed. The jury recommended that defendant be sentenced to life imprisonment by a 12-0 vote. The trial judge expressed his appreciation to the jury for its service and recommendations as to the sentence. He then proceeded to dictate into the record his reasons for not following the jury's recommendation of life imprisonment and imposed a sentence of death in the electric chair.
The evidence presented at the trial that the defendant and one James Pinkney entered a Royal Castle and ordered food. Pinkney testified defendant told him to stick around "that something was going to happen". That when Richard Dean, Manager *3 of the Royal Castle, went to the back, defendant jumped over the counter and grabbed something, at which time Dean returned. The defendant rushed Dean, and they both struggled into the back. The tussling continued back to the front, and at this time, Dean had a knife, and defendant attempted to hit Dean with a stool. About this time, Dean ran outside with the defendant in pursuit. The defendant, according to Pinkney, again made contact with Dean and somehow got the knife away from Dean and while still struggling stabbed Dean several times. Dean fell with the knife in his chest. After the stabbing, Pinkney testified, defendant want back inside, grabbed the bills from the cash register and ran away. Shortly thereafter, he saw the defendant in a phone booth counting the money, and defendant gave him $20.00.
The only other witness was the defendant, who made two statements to the authorities and testified in his own defense at the trial. The defendant's statements and his testimony at the trial, as to his version of the events leading up to the death of Dean, were essentially the same. Defendant's testimony was that he and Pinkney met in front of the Royal Castle, and Pinkney wanted to go in and rob the Royal Castle, by physically taking the money from Dean, but defendant suggested he could take the money from the cash register while Dean was in the back without his knowing about it. There was no testimony that either Pinkney or defendant was armed with a weapon of any kind. Both entered the restaurant, and when Dean went to the back, defendant told Pinkney to go outside and watch while he jumped over the counter. When he was about to get to the cash register, Dean returned and started hollering at him to get out and that he was going to call the police. Defendant testified that Dean picked up a butcher knife and attacked him, that he started to run, but Dean grabbed him, that during the struggle inside the restaurant he tried to throw a cup at him, grabbed at a butcher knife, but dropped it and finally picked up a stool and threw it at Dean. Dean then ran out the door and turned left, that he ran out behind him and turned right, and when Dean saw he was not chasing him, he turned around and started chasing the defendant. Defendant testified that he slipped and fell, and Dean, with the knife, jumped on him, and they started fighting again. That he tried to hold Dean's hand to keep him from stabbing him, and he somehow got the knife away from Dean. Dean started choking him, and while Dean was choking him, he stabbed him, he believes, twice. After the stabbing, the defendant said he went back into the restaurant and discovered the money and Pinkney both gone.
The appellant has raised six points on appeal. The first point relates to admitting one of the confessions made by the defendant. Upon reviewing the record, it is apparent that this alleged confession was primarily a self-serving statement and was similar to another unquestioned statement, as well as defendant's testimony at the trial. The death of the deceased by defendant was never in question, only the manner in which it occurred was in issue. The motion to suppress was fully heard by the court and denied, and if error was harmless.
Appellant claims the court erred in instructing the jury on felony murder. Upon reviewing the evidence, we find there was sufficient evidence for the jury to find the homicide to have been committed in the commission or the attempted commission of a robbery and instructing the jury on felony murder was not error. The remaining four points raised by appellant has to do with the court's sentencing the appellant to death.
Challenge is again made as to the constitutionality of the imposition of the death sentence, pursuant to Sections 775.082, 782.04 and 921.141, Florida Statutes. This court has previously ruled the imposition *4 of the death penalty, in accordance with the foregoing statutes, as not being in violation of either the Florida or United States Constitution, and we can find no reasons to depart from our earlier ruling in State v. Dixon, 283 So.2d 1 (Fla. 1973).
The court did not request a presentence investigation prior to sentencing appellant. Such failure is urged by appellant as being in violation of Rule 3.710, Florida Rules of Criminal Procedure, which states:
"Presentence Report.
In all cases in which the court has discretion as to what sentence may be imposed, the court may refer the case to the probation and parole commission for investigation and recommendation. No sentence or sentences other than probation shall be imposed on any defendant found guilty of a first felony offense or found guilty of a felony while under the age of 18 years, until after such investigation has first been made and the recommendations of the commission received and considered by the sentencing judge."
The Committee Note of Rule 3.710 gives a fair indication of the meaning and scope of the Rule and reads as follows:
"1972 Committee Note:
The rule provides for the utilization of a pre-sentence report as part of the sentencing process. While use of the report is discretionary in all cases, it is mandatory in two instances, the sentencing of a first felony offender and of a defendant under 18 years of age. Of course, no report is necessary where the specific sentence is mandatory, e.g., the sentence of death or life imprisonment in a verdict of first degree murder." Committee Note, Rule 3.710, Rules of Criminal Procedure.
Thus we hold that once the jury returns a verdict of first degree murder, the trial court is exempt from the mandatory presentence requirements of Rule 3.710, Rules of Criminal Procedure.
Appellant alleges that the trial court failed to comply with the requirements of Section 921.141, Florida Statutes, in that it failed to make specific written findings of fact concerning aggravating or mitigating circumstances on which the court's death sentence was based. In this case, the trial court, after receiving the advisory opinion from the jury and prior to sentencing appellant, dictated into the record his findings of fact for imposing a sentence of death. Such dictation, when transcribed, becomes a finding of fact in writing and provides the opportunity for meaningful review, as required by 921.141, Florida Statutes.
The most important point raised by the appellant is whether the trial court erred in sentencing appellant to death.
In this case, we have a 17-year-old male who entered, unarmed, into the restaurant for the purpose of illegally getting money. He had no prior criminal record. The evidence is conflicting as to whether the appellant entered the restaurant with the intent to rob or only with the intent to take the cash when the manager was in the back. As a result of appellant entering the restaurant, a fight ensued when the deceased caught appellant in his attempt to take the money from the register. The deceased was armed with a knife, and after tussling around the restaurant, deceased ran outside still holding the knife. Appellant ran out behind him. Upon leaving the premises, the testimony is conflicting. Pinkney, who had turned state's evidence, testified the appellant ran after deceased, that deceased swung at appellant with the knife, but appellant grabbed deceased, took the knife away from him and while holding him stabbed him several times. Appellant's version was that he ran out behind deceased and turned the other direction and when deceased saw him running away *5 turned and ran after him. While running away, he slipped and fell, and deceased jumped on him and tried to stab him. He says he somehow got the knife away and while deceased was choking him stabbed deceased at least twice.
The jury had sufficient evidence, based on the testimony, to justify a verdict of murder in the first degree. However, when the jury deliberated on its advisory opinion after being fully charged to consider all of the aggravating and mitigating circumstances required by Section 921.141, Florida Statutes, they returned a unanimous verdict recommending a sentence of life imprisonment. The jury, in effect, found the mitigating circumstances were such that the death penalty would not be proper.
This court is well aware that the recommendation of sentence by the jury is only advisory and is not binding on the trial court. However, the advisory opinion of the jury must be given serious consideration, or there would be no reason for the legislature to have placed such a requirement in the statute. It stands to reason that the trial court must express more concise and particular reasons, based on evidence which cannot be reasonably interpreted to favor mitigation, to overrule a jury's advisory opinion of life imprisonment and enter a sentence of death than to overrule an advisory opinion recommending death and enter a sentence of life imprisonment.
Section 921.141, Florida Statutes, requires this court to provide a review of a sentence of death. In Dixon, supra, we said:
"... review by this court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in the light of the other decisions and determine whether or not the punishment is too great ..."
In Dixon, supra, we determined that it was the legislative intent to extract the penalty of death for only the most aggravated and the most indefensible of crimes.
The jury, in considering all of the evidence, believed the appellant guilty, but upon consideration, unanimously rejected the idea of imposing the ultimate penalty. We find no objection to the jury's determination.
Therefore, the order imposing the sentence of death be and the same is hereby reversed with directions to impose a sentence of life imprisonment in accordance with law and the recommendation of the jury.
Accordingly, this cause is affirmed in part, reversed in part and remanded for further proceedings consistent herewith.
OVERTON, J., and DUVAL, Circuit Judge, concur.
ADKINS, C.J., and ROBERTS, J., concur with opinion and judgment, and concur specially with an opinion.
BOYD, SUNDBERG and HATCHETT, JJ., dissents with an opinion.
ADKINS, Chief Justice and ROBERTS, Justice (concurring specially).
We concur in the opinion and judgment announced in the Per Curiam decision for the reason that we have been unable to attract the support of two other Justices for a full affirmance of the judgment of guilt and sentence of death. For that reason, the best decision obtainable is that announced in the Per Curiam decision which affirms the judgment of guilt but reduces the sentence to life imprisonment. We *6 have concurred in such disposition of the case as being the most just obtainable. However, it would be our preference to affirm both the judgment of guilt and sentence of death.
The homicide was committed while the defendant was attempting to commit a robbery for pecuniary gain. It was committed in a heinous, atrocious and cruel manner.
There is a distinction between a defendant firing a pistol at his victim and plunging a knife into his body. A shot may be fired in a sudden outburst of emotion or because of a "hair-trigger," but the use of a knife necessitates a period of cold calculation. To plunge a knife nine inches into the deceased's body, not once, but twice, and then to plunge it into the back of the victim, required reflection and murderous calculation. The Court, in considering the aggravating circumstances, said:
"The Court nevertheless finds that notwithstanding your recommendations, there are sufficient aggravating circumstances as contemplated by Subsection 6 of Section 921.141 of the Florida Statutes which require the Court to adopt a contrary view.
"The Court is mindful of the Defendant's youth in this case, but this Court does not view that youth alone is a sufficient mitigating circumstance such as might tend to excuse the grossness of this crime from the maximum penalty.
"The Court is also mindful that the Defendant has no prior criminal record but the very fact that the Defendant has no prior criminal record does not give him a license to commit the grossest sort of crime, as the Court views this crime to be.
"The record in this case and the evidence which this Court believes is such as to convince this Court that the Defendant had an opportunity to withdraw but instead chased the deceased out the door of the Royal Castle establishment and engaged in an affray in the street in which the Defendant acquired the knife which the deceased had in his hand and plunged it into the chest of the deceased to its maximum hilt, that is to say, nine inches or thereabouts as the evidence shows and that not only did he plunge it nine inches twice but he plunged it once again somewhere in the back.

"The Court finds that the Defendant's youth and his physical circumstances could have been such to have permitted him to withdraw at any time, that he chose not to do this.
"This court has considered other circumstances and the Court views this case to be a classic case of what we refer to as felony murder and felony murder in the first degree in this case.
"This Court finds that the offense was committed for the sole purpose of acquiring money wrongfully which is another one of the items which we are entitled to consider under the Statute.
"The Court finds that the weapon used and the circumstances were such that the Defendant is not entitled to mercy.
"In that case, under these circumstances, Counsel, bring the Defendant forward for further proceedings." (Emphasis supplied)
In analyzing the evidence in connection with aggravating circumstances and mitigating circumstances, we reach the same conclusion as the trial judge.
There was no element of self-defense; the homicide was committed on the public streets; the defendant was willing to take a human life for the purpose of a small pecuniary gain; and the defendant was determined to inflict mortal wounds on the deceased in a cruel manner.
BOYD, Justice (dissenting).
I dissent.
The record clearly indicates Appellant is guilty of murder, but I must dissent to the *7 majority opinion. The trial court erred by admitting a confession secured from Appellant after he had stated he did not want to talk to policemen about the crime but wanted to talk to a lawyer instead.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court of the United States said regarding an accused person in custody:
"... If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (see 384 U.S. 444-445, 86 S.Ct. 1612, 16 L.Ed.2d 707)
To me, this language means that, although an incarcerated person accused of a crime may formally waive all of his Miranda warnings, he may at any time demand an attorney and then he will be privileged to remain silent until he secures his own counsel, if financially able, or until a public defender is appointed if he is indigent. It is improper for policemen, investigators or prosecutors to try to persuade the accused that he should waive his rights and confess without benefit of counsel. When the prisoner says that he will remain silent, the interrogation should stop. The instant record shows that Appellant was given his Miranda warnings both orally and in writing; but I construe Miranda to mean that, although a defendant may waive his rights, he can later withdraw the waiver and invoke his constitutional rights at any time as to any future interrogation.
In United States v. Crisp, 435 F.2d 354, 357 (7th Cir.1970), according to the FBI investigating agent, the accused person stated "he was unwilling to discuss any activities on his part concerning the bank robbery or any bank robbery in which he might have been involved." Despite this, police interrogation continued, and the agent asked the suspect "if he was willing to discuss the circumstances surrounding his activities before and after the bank robbery." The defendant agreed and interrogation continued. The Circuit Court of Appeals held that to be a violation of the rights expressed in Miranda, supra.
In Wakeman v. State, 237 So.2d 61 (Fla.App. 1970), cert. dism., Fla., 243 So.2d 419, the Court held that it was a violation of the defendant's Miranda rights for the police to question her about the crime after she had requested an attorney and while, with the full knowledge of the police, her lawyer was on his way to the jail.
The following direct quotations from the trial court record sub judice of questions propounded to both interrogators and Appellant show the events occurring during this Appellant's incarceration:
* * * * * *
"Q [Officer Cunningham] ... Did he at any time say that he wished to remain silent?
"A No, sir. He did not.
"Q Did he at any time request an attorney?
"A No, sir.
"Q Did he at any time request that the interview cease?
"A No, sir. The only thing he said was he would like to tell his attorney first and we told him he could tell us just as well and that his attorney would not be able to tell us what he said so he wanted to tell us himself.
"Q All right, and did he read all of the rights or did he read the card that you have in your hand?

*8 "A He was handed the card and I presume he read it. He was looking at it.
"Q Did he turn the card over?
"A Yes, sir; because he had to sign it on the back of the card.
"Q Did he sign it on the back of the card in your presence?
"A Yes sir. He did.
"Q And did you proceed at that point to interview this Defendant?
"A Yes sir. We did.
"Q And was this interview put on tape?
"A Yes, sir. It was.
"Q Was this interview typed up?
"A Yes, sir. It was."
* * * * * *
"Q Officer Cunningham, you indicated just a few seconds ago something about Mr. Thompson wanted to tell his attorney first?
"A Yes, sir.
"Q He indicated that to you?
"A Yes, sir.
"Q And then what did you tell him?
"A I advised him if he told you that he would not be able to tell us what happened.
"Q And then he went ahead and told you?
"A Yes, sir.
"Q Did you make any promises to him?
"A No, sir.
"Q Did you tell him it would go easy on him if he gave this statement?
"A No, sir. The only thing we advised him was the difference in the charge of first degree murder and the charge of third degree murder.
"Q But he did ask for an attorney? He wanted to tell an attorney first?
"A Yes, sir, and we advised him if he told an attorney first he would not be able to talk to us and tell us his side of the story.
"Q And you say you handed the card to Mr. Thompson and then he handed it back to you, but you didn't read any rights to him?
"A We advised him of his rights verbally. I handed him the card. He read the card. We advised him to turn it over on the back and he read the open part. He signed it. Officer Latham signed it. I signed it.
"Q When did he tell you he wanted to talk to an attorney first in relation to the card?
"A Quite some time after.
"Q So he signed the card and he told you he wanted to talk to an attorney first?
"A No, sir. This was some time afterward. The only thing he said was that he would like to tell his attorney first and we advised him that if he told his attorney, he could not tell his side of the story."
The following are questions by counsel and answers of Appellant:
"Q Have you made any statements in the presence of any police officers?
"A Yes, sir.
"Q Do you recall when you made the statement?
"A I don't recall the exact date.
"Q Do you recall who was present?

*9 "A Yes, sir.
"Q Who was there?
"A Officer Cunningham and Officer Latham.
"Q And where did that take place?
"A On the fifth floor of this building.
"Q Where at on the fifth floor?
"A In a small interview room.
"Q Do you recall being asked some questions?
"A Yes, sir.
"Q Did you ever ask for an attorney?
"A Yes, sir.
"Q What happened when you asked for an attorney?
"A Well, Officer Cunningham told me that if I would talk to my attorney first that I wouldn't be able to, that they wouldn't be able to take my statement from me.
"Q And what happened after that?
"A Well, Officer Cunningham kept on trying to persuade me to give them a statement."
* * * * * *
"Q And you told him you wanted to talk to an attorney first? Did he stop questioning you?
"A Well, no, sir, first when they first told me that they wanted a statement, I told him that I didn't want to talk to him because I didn't want to make a statement because I didn't trust them."
In admitting the confession obtained by police under the above circumstances as evidence against Appellant over objections of his attorney, I feel the trial court violated one of the basic Miranda rights required by present Federal and State constitutional standards. The record shows Appellant, in the presence of his attorney, later confessed and admitted his guilt at trial. It can be argued that the later confession rendered the admission into evidence of the improper first confession of no consequence and excuses it under Florida's harmless error statute, Section 924.33, Florida Statutes, which reads as follows:
"924.33 When judgment not to be reversed or modified.  No judgment shall be reversed unless the appellate court is of the opinion, after an examination of all the appeal papers, that error was committed that injuriously affected the substantial rights of the appellant. It shall not be presumed that error injuriously affected the substantial rights of the appellant."
I am persuaded, however, that once an unconstitutional confession is secured a good lawyer, knowing or believing it will be admitted, may feel that his client's only hope of avoiding a death sentence would be a full confession which otherwise would not have been made.
Because I feel Appellant's constitutional rights to remain silent and to have counsel as requested were violated, I must respectfully dissent to the majority opinion; I would hold that a new trial should be granted without use of any confession heretofore made by Appellant.
SUNDBERG, Justice (dissenting).
I must respectfully dissent from the decision of the majority in this case in that I do not conclude, as does the majority, that the introduction of the first statement made by the defendant, over objection, constitutes harmless error within the purview or intent of Section 924.33, Florida Statutes. I feel constrained to separately state the basis of my dissent in that, at this juncture, I am not prepared to embrace without reservation the dissent of my colleague, Mr. Justice Boyd. I say this because I do not believe it is necessary in the instant case to reach so far as Mr. Justice Boyd does in his dissent.
*10 It appears clear from the colloquies quoted from the transcript in Mr. Justice Boyd's dissent that prior to the State's obtaining the statement of confession in question herein the defendant requested aid of counsel to consult with before making the statement. I firmly believe that Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, requires that once an accused requests the aid of an attorney the questioning by his interrogator must cease forthwith notwithstanding the fact that, with full understanding and appreciation, he has previously received a full and fair explanation of his constitutional rights. The rationale for the Miranda rule as it relates to entitlement to counsel after a request by the accused is well set forth in the Miranda decision and those which have followed and, therefore, I do not deem it necessary to expound the rightness of the rule. The majority concludes that even though the trial judge may have been in error in failing to suppress the statement which was recorded subsequent to the request for counsel such error was harmless in that it was exculpatory and essentially in accord with a subsequent statement given by the accused after he was represented by counsel as well as with his testimony at trial. A close review of the statements and the testimony, however, belies this analysis. The pertinent portion of the original statement, made at the Orlando Police Department on October 18, 1973, is as follows:
"Q Would you please relate to us what happened between you and Richard Dean at the Royal Castle on East Church St.?
"A Ah, okay I was in the place and I went in ah, and I was going to robb it and so the man went in the back and I jumped over the counter, you know I was gonna go in the cash register while he was in the back and get out of the place before he knew it. Okay, so I was watching him though the tile on the glass and he had started up toward the front for something and he seen me through the tile and so he started hollering at me, and ah to get out of there and he was going to call the Police and stuff. And so he started to move around the counter, I mean up toward the front and so I moved out in front of him. And you know, I thought I could scare him and so he ran back and grabbed a butcher knife off the sink back there in the back, and so he started at me with it and I started to run and you know he caught me, so we started struggling inside the place and I, I tried to grabb ah a one of the table knives and I dropped it on the floor and so we was struggling and I got away from him and I went to, I ran back to where the stool was at. I picked up the stool and I started back toward the front and I wasn't sure whether he had the knife or not. I threw the stool at him and so he ran outside the place and I ran outside and when we got outside we started fighting and all, all it was I was trying to keep him from stabbing me, and he just kept on fighting. I finally got the knife away from him and he was still fighting and I stabbed him."
As elicited from Officer Cunningham at trial upon cross-examination by counsel for the defendant, the pertinent portions of the second statement given to the law enforcement officer prior to trial but while counsel for the defendant was present, is as follows:
"Q I didn't quite understand you, Officer Cunningham.
"Who ran out the door first?
"A According to the second statement, Mr. Dean ran out the door and he turned east on Church Street and the Defendant ran out the door and turned west on Church Street.

*11 "Q And what happened then?
"A According to the second statement, the Defendant fell.
"Q Officer Cunningham what do you recall about what Mr. Thompson said?
"A He ran west on Church Street falling in about the middle of Court Street, Mr. Dean still with the knife, ran towards him. A struggle ensued. He took the knife away from Mr. Dean and stabbed him approximately two or three times and then continued running west on Church Street." (Emphasis supplied)
At trial the defendant testified in the following manner concerning the events of the evening in question:
"[A] ... At that time he ran to the sink and picked up the butcher knife and attacked me.
"Q And where did that take place, in the Royal Castle, out front or in back or where?
"A In front, right behind the counter.
"Q So what did you do?
"A Well, I turned around and started to run when I seen him coming at me with the butcher knife.
"I ran into the counter and Mr. Dean got me. I tried to grab a cup to throw at him or something.
"I dropped the cup on the floor. I saw a butcher knife on the counter and I tried to grab it but I dropped it.
"Mr. Dean grabbed me and we got to fighting between the juke box and the counter and the corner.
"Q And did he have the knife in his hand at that time?
"A Yes, sir.
"Q Pardon?
"A Yes, sir.
"Q What took place at that time?
"A Mr. Dean tried to stab me with the knife and I finally broke away from him and ran and picked up the stool and Mr. Dean started to come at me again.
"I threw the stool at him and hit him on the right side of his body.
"Q And what did he do at that time?
"A Mr. Dean turned around and ran out the front door and he turned left going down Court Street and I ran out a few feet behind him and turned right to go around the corner.

"Q Going out the front door, he went left and you went right?

"A Yes, sir.

"Q And what happened at that time?
"A When Mr. Dean saw that I wasn't chasing him, he turned around and started chasing me.

"Q Where were you at that time?
"A I was just getting to the corner.
"Q And what happened at that time?
"A Well, when I got around the corner, I slipped and fell and Mr. Dean caught me.

"He jumped on me and we started to fight again.
"I kept trying to hold his hand to keep him from stabbing me. I finally got the knife away from him and then he started to choke me.
"Q And what happened at that time?
"A Well, I reached around in back with the knife in my hand and I stabbed him in his face. I wasn't *12 sure whether I stabbed him or not because he continued to choke me.

"Q So what did you do?

"A Well, then that's when I stabbed him in his chest." (Emphasis supplied)
It can be observed that the second statement made by the defendant as well as his testimony at trial varied in two essential respects from the original statement made on October 18, 1973: First, it is clear from the second statement and the testimony at trial that although the victim ran from the premises first with the butcher knife in hand he turned in one direction and the defendant, after following the victim out, turned and ran in the opposite direction, whereas in the original statement it appears that the defendant simply followed the victim out the door in a continuous, uninterrupted affray with the defendant being the pursuer; second, the second statement as well as the testimony at trial make it appear that as the defendant was attempting to escape he fell, the victim jumped upon him and commenced to choke him before the defendant wrested the knife from the victim and commenced the stabbing, whereas in the original statement the inference can readily be drawn that the defendant was the aggressor. It seems clear to me that the account contained in the first statement could have been sufficient to tilt the scales in favor of the State on the matter of first degree murder as opposed to the lesser included offenses upon which the jury was charged by the trial judge. The fact that the jury unanimously recommended life imprisonment as opposed to death lends credence to this assumption.
The fact that the defendant took the stand and testified concerning the same events described in the original statement affords no reason for waiver of the constitutional guarantees afforded him by the Fifth and Fourteenth Amendments to the United States Constitution. The only authority relating to use of an improperly obtained confession when the defendant testifies at trial is limited to the use of such a statement for impeachment purposes only. Such authority is represented by cases such as Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). It is clear from such cases that confession evidence improperly obtained may not be used in the State's case in chief, but may be used only for impeachment when the defendant takes the stand and testifies in opposition to the statement previously made. The rationale for such a rule is well stated in the Hass opinion wherein Mr. Justice Blackmun states:
"As in Harris, it does not follow from Miranda that evidence inadmissible against Hass in the prosecution's case in chief is barred for all purposes, always provided that `the trustworthiness of the evidence satisfies legal standards.' Again, the impeaching material would provide valuable aid to the jury in assessing the defendant's credibility; again, `the benefits of this process should not be lost'; and again, making the deterrent effect assumption, there is sufficient deterrence when the evidence in question is made unavailable to the prosecution in its case in chief. If all this sufficed for the result in Harris, it supports and demands a like result in Hass' case. Here, too, the shield provided by Miranda is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances."
In the case sub judice the statement was introduced in the State's case in chief and was in nowise offered to impeach any testimony of the defendant from the stand.
If the prophylactic effect of Miranda is to be obtained we may not engage in the practice in a case such as this of characterizing as "harmless error" the failure to *13 suppress evidence obtained in contravention of the rights secured by the Constitution of the United States and of the state of Florida regardless of the balance of the testimony in the record which may point to guilt of the crime for which the defendant is convicted. Accordingly, I would reverse with instructions for a new trial at which the statement in question is excluded.
HATCHETT, Justice (dissenting).
Like Mr. Justice Boyd and Mr. Justice Sundberg, I dissent from the affirmance of the conviction on account of the clear Miranda violation. I believe the language Mr. Justice Boyd cites from the decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the excerpts he quotes from the interrogators' testimony, establish that the original statement was improperly admitted; and I believe Mr. Justice Sundberg has shown, by reference to other portions of the transcript, that admission of that statement might reasonably have affected the outcome of the case. I concur in the view that introduction of the first statement appellant gave while in custody tended to corroborate the prosecution's theory of "a continuous, uninterrupted affray with the defendant being the pursuer." Ante, p. 12 If the jury had accepted the competing defense version of the facts, a verdict of first degree murder would not have been inevitable, or even very likely, in my opinion.
The inadmissibility of a custodial statement ought not automatically render inadmissible subsequent custodial statements, in my view. On this account, I do not join Mr. Justice Boyd's dissent, although I share his belief that later confessions are generally the product of the first, uncounselled one, in cases like the present case. If objected to, such later confessions should be excluded, unless, at a hearing held outside the jury's presence, the prosecution shows, by a preponderance of the evidence, see Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); McDole v. State, 283 So.2d 553 (Fla. 1973), independent volition sufficient to purge the taint of the primary illegality. Westover v. United States, 384 U.S. 436, 496-7, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Cf. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), 17 Cr.L. 3145; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The temporal proximity of subsequent statements is relevant to such a determination, as well as the whole range of intervening circumstances and events. At the very least, where a statement has been illegally elicited from an accused in custody, no subsequent custodial statement should be admitted, unless the prosecution can show that the accused understood, at the time of the later statement, that the original statement could not be used against him at trial. Mere recitation of the Miranda warnings, in the interim between statements, cannot suffice to erase the taint. Brown v. Illinois, supra. Contra, State v. Oyarzo, 274 So.2d 519 (Fla. 1973); Gustafson v. State, 273 So.2d 86 (Fla.App. 4th Dist. 1973) cert. discharged 287 So.2d 69 (Fla. 1973). If the accused consults with counsel, however, and gives the later statement in counsel's presence, as happened here, the later statement should ordinarily be admissible, unless, for example, defense counsel justifiably relied on factual misrepresentations by prosecutorial or law enforcement personnel, in concluding that the original statement would be admissible, and so advising the accused.