STATE of Missouri, Respondent,

v.

Aaron DeWayne PHILLIPS, Appellant.

No. WD 34379.

Missouri Court of Appeals,
Western District.

March 13, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
May 1, 1984.

James W. Fletcher, Public Defender, Sean D. O'Brien, Asst. Public Defender, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Carrie Francke, Asst. Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before PRITCHARD, P.J., and SHANGLER and BERREY, JJ.

PRITCHARD, Presiding Judge.

By the verdict of a jury, appellant was convicted of forcible rape, forcible sodomy, first degree robbery, and first degree assault. He was sentenced for these offenses, respectively, to imprisonment for life, 100 years, 20 years and 20 years, to run consecutively.

One issue is whether appellant's incriminating statements, some oral as made to Detective Paul MacDougall, and some being videotaped, should have been suppressed as not being voluntary. There was no evidence presented to the jury as to appellant's oral confession to MacDougall, but only the videotaped confession was shown to it.

MacDougall first contacted appellant at about 9:00 p.m., on February 11, 1982, in the interrogation room of the police headquarters, where the two were alone. MacDougall read appellant his *Miranda* rights off of a rights waiver form and asked him if he understood his rights. Appellant stated that he did understand them, but when he was asked to sign the waiver form he refused to do so, saying, according to MacDougall's report, that every time he signs something he ends up in jail. MacDougall did not offer to break off the interrogation, to get appellant an attorney, or to clarify what his rights were, but appellant then volunteered to answer questions, and MacDougall orally interrogated him for about an hour and ten minutes, and shortly afterwards, he went back to his office and wrote down what had occurred to the best of his memory. Appellant told MacDougall basically the same things in his oral statement as he did in the later videotaped statement, but not in as much detail.

Appellant's Point I is divided into two parts. The first part is that the trial court erred in denying his motion to suppress the oral confession given to MacDougall because he refused to sign the waiver of rights form, saying that every time he signs something he ends up in jail. Appellant says that his refusal and statement was a clear indication of his belief that without a signed waiver, a statement could not be used against him in a court of law, and that belief precluded him from making a knowing, intelligent waiver of his Fifth Amendment rights.

Here the record shows that appellant was orally informed of his *Miranda* rights by Detective MacDougall prior to being asked to sign the form. Thereafter, appellant indicated a willingness to be questioned. In *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979), it was held that there is

no constitutional mandate for a per se rule stipulating that an express written or oral waiver is necessary to sustain the state's burden of proof to show a suspect's waiver of his rights. In *State v. Groves*, 646 S.W.2d 82, 85[7] (Mo. banc 1983), it was said, "It has been repeatedly held that a defendant who refuses to sign a written waiver may nonetheless voluntarily waive the exercise of his *Miranda* rights by orally indicating his willingness to cooperate with the police questioning. [Citing *U.S. v. Zamarripa*, 544 F.2d 978 (8th Cir.1976) *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977).]" See also *State v. Clark*, 592 S.W.2d 709, 715–716 (Mo. banc 1979), cert. denied, 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 57 (1980); *State v. Urhahn*, 621 S.W.2d 928, 931[1][2] (Mo. App.1981), and cases cited and quoted.

At the conclusion of the oral interrogation, appellant was asked by MacDougall if he wished to talk to him further and on videotape with a television, and appellant said he would like that. This occurred about 10:15 p.m., and they went to the videotape room on the second floor of Police Headquarters. The videotape transcript of that proceedings shows this: "Det. MacDougall: I'm Paul MacDougall, assigned to the Kansas City, Missouri Police Department, Sex Crime Unit. This is the Kansas City, Missouri Police Department Video Taped Statement of one AARON D. PHILLIPS, being taken in regards to an offense that was committed at 3628 Warwick on the sixth of February, 1982. Statement is being conducted in the Investigations Bureau Video Room, second floor. Police Headquarters, 1125 Locust, Kansas City, Missouri. Okay, AARON, you realize you have been arrested for the rape ... AARON PHILLIPS: Yes, sir. DET. MacDOUGALL: of a lady at 3628 Warwick on the sixth of February. Okay, if you would, I want you to read aloud to me, these two paragraphs. Read it out loud to me. AARON PHILLIPS: I'm speechless. DET. MacDOUGALL: You're speechless. Okay, take a minute and gather your thoughts. Okay, would you like for me to read it to you? AARON PHILLIPS: Yes.

DET. MacDOUGALL: Okay. Prior to any questioning, I have been advised of my rights to remain silent, that anything I say can and will be used against me in a court of law. I have the right to consult with a lawyer, and have a lawyer present with me during questioning, and if I can't afford a lawyer, one will be appointed for me at no cost, prior to questioning. I have also been told that I can stop making a statement at any time and I understand all of the above and I am willing to talk to you. No promises or threats have been made against me. You understand everything I said? AARON PHILLIPS: Umuh (yes). DET. MacDOUGALL: Okay. You do understand your rights. Is that correct? AARON PHILLIPS: I understand my rights. DET. MacDOUGALL: Okay. You also understand that this statement is being videotaped? AARON PHILLIPS: Yes. DET. MacDOUGALL: And the camera has been running since we've sat in here? AARON PHILLIPS: Uh, yes. DET. MacDOUGALL: Okay. You understand all of that? AARON PHILLIPS: Yes. DET. MacDOUGALL: Okay. You want to tell me who you are?" Appellant then proceeded to confess to participating in the rape.

MacDougall testified that when he offered appellant a moment to gather his thoughts, he did not actually take any appreciable time to do so; MacDougall did not break off or offer to break off the interrogation when appellant said, "I'm speechless", or try to find out what he meant, or to allow him to talk to an attorney or to offer to call one for him, but continued the interrogation. On cross-examination (at the pre-trial hearing) MacDougall testified that he did not know appellant was in special education in high school or that he was mentally retarded. [There was no evidence of those facts, but there was evidence that appellant had completed the twelfth grade.] MacDougall further testified that appellant never asked him to call an attorney, to break off the interrogations, or to stop it. He made no promises or threats to induce appellant to make the videotaped statement, and he was

unarmed during the interrogations. The videotaping procedure lasted about 45 minutes.

Appellant contends further under his Point I that his statement at the outset of the videotaping that "I'm speechless" invoked his right to remain silent thereafter, and thus that recorded statement should not have been admitted into evidence because it was involuntary.

Without doubt, appellant's statement that "I'm speechless", had it stood alone, might have been interpreted as an indication that he wanted to halt the videotaping procedure. That statement, again standing alone, is ambiguous, and in that circumstance there is authority that the interrogator is under a duty to clarify it and to ascertain what the suspect is attempting to do. See *Thompson v. Wainwright*, 601 F.2d 768, 771 (5th Cir.1979). In this case, however, Detective MacDougall did make a sufficient clarification of appellant's statement, which could have meant that he either could not, or did not want to, read it aloud himself, by inquiring, "Okay, would you like me to read it to you", to which appellant answered, "Yes". Then followed MacDougall's reading the full panoply of the *Miranda* rights, after which appellant affirmatively stated that he understood his rights, that the interrogation was being videotaped. Thereafter, he began to volunteer information which eventually incriminated him. Under this record, at no time did appellant indicate in any manner, at any time prior to or during questioning, that he wished to remain silent, which, if so, might have brought into play the scrupulous honoring of any such indication of a desire to remain silent under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Rather, the record shows that the state made a prima facie showing of voluntariness of appellant's statements under *State v. Gibson*, 547 S.W.2d 861, 863[3] (Mo.App.1977), by proof (1) that during all stages of the interrogation, appellant was informed of his rights; (2) he understood those rights; and (3) that there was no physical force or coercion, promises, threats or other unlawful means to induce

him to make incriminating statements. Point I is overruled.

■ By Point II, appellant contends that error was committed when the court allowed the prosecutrix to testify as to her mental condition and treatment therefor following the alleged offenses. She testified that following the occurrences she went to St. Luke's Hospital where a lady from MOSCA (an organization which specializes in treating victims of sexual abuse) was there to help her. She went to one meeting and did not feel that they could help her. A few weeks afterward, she moved into a new apartment, and had "what was termed as just a nervous breakdown after that." She found herself sitting in the middle of the street, and did not move or talk for three days, and she had been receiving therapy once a week since then. The date of the offenses was shown to have been on February 6, 1982. Trial began October 25, 1982. Appellant concedes that the victim's mental and physical condition, shortly after the offenses, is relevant and admissible, but contends that the conditions and treatment therefor existent more than eight months later was too remote. Appellant cites *State v. Houx*, 109 Mo. 654, 19 S.W. 35 (1892), where the court found that the victim's physical condition three months after the offense was too remote, but the error in the admission of that evidence was harmless where the jury assessed the minimum sentence.

On the four offenses for which appellant was convicted, the indictment charges that the rape was committed by forcible compulsion and without the victim's consent; the sodomy was committed without consent and by forcible compulsion; the robbery was committed by force; and the first degree assault was committed by the use and assistance of a dangerous instrument. The testimony of the victim shows these brutal acts committed upon her by appellant and his accomplice: At the time the victim was accosted in the basement laundry room of the building adjacent to her apartment building, a tall black man had a knife to her

throat, and the short black man (appellant) was waving a pole at her. They took from her two rings and a necklace. The tall man told her to take off her jeans, after which he raped her while standing up. The knife was close to her throat the whole time. Both men kept saying to her to shut up or else they would kill her. The short man then attempted to rape her standing up, but did not penetrate her, at which time the other man inserted his penis in her rectum. They instructed her to lie down, at which time the short man attempted to rape her again, and the tall man instructed her to take hold of his penis and masturbate him, which she did, and he also inserted his penis in her mouth. After the short man had finished, the tall one raped her again, licked her vagina and cut off her pubic hair with his knife. The two men then found a rope and tied her ankles, during which time the tall man picked up a long square stick and attempted to put it in her vagina, but did not succeed so he told her to do it. On her protest, he threatened to kill her, so she placed it in the area and he shoved it up her vagina several times. Appellant pulled the rope up around her back and tied it around her throat, then down where he started to tie her hands. The tall man then came up with the knife and slashed it across her throat, penetrating it, leaving a small scar. She got her hands free and pushed his hands away, and the two men ran out. The victim's version of what occurred is consistent with appellant's version given on the videotape, a transcript of which is in the legal file.

In this case, considering the brutality of the assaults, batteries and rape at the initial contact by appellant and his accomplice, it is by no means beyond consideration that the mental trauma of the victim would extend beyond the immediate physical trauma. The testimony of the victim as to mental trauma and the receipt of therapy therefor (the nature of which and its results not being in evidence) was certainly relevant to the brutality of the assaults, the elements of force involved, and the lack of consent thereof, all elements of the state's case. Compare *State v. Johnson*, 637 S.W.2d 157, 161[9–11] (Mo.App.1982); *State v. Perry*, 643 S.W.2d 58, 62[8–10] (Mo.App.1982); and *State v. Berry*, 609 S.W.2d 948, 954[16–19] (Mo. banc 1980). Since the evidence of the victim's physical and mental conditions, at least up to the time of trial some eight months later, were relevant and material, the trial court did not err, in its discretion, in admitting it. Considering the brutality and the severity of the injuries inflicted on the victim, and the legitimate inference that the severity thereof continued, the ancient case of *State v. Houx*, supra, is not controlling.

The judgment is affirmed.

All concur.