Larry **THOMPSON**, Petitioner-Appellant,

v.

**Louie L. WAINWRIGHT, Secretary, Department of Offender Rehabilitation, Respondent-Appellee.**

No. 77–1084.

United States Court of Appeals, Fifth Circuit.

Aug. 27, 1979.

Rehearing Denied Oct. 2, 1979.

Craig S. Barnard, Asst. Public Defender, 15th Judicial Circuit of Florida, Richard L. Jorandby, Public Defender, West Palm Beach, Fla., for petitioner-appellant.

Robert L. Shevin, Atty. Gen., Wallace E. Allbritton, Michael H. Davidson, Asst. Attys. Gen., Tallahassee, Fla., for respondent-appellee.

Before JONES, GODBOLD and GEE, Circuit Judges.

GEE, Circuit Judge:

In this case we decide whether police interrogators violated *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in the course of taking an incriminating statement from a youth arrested for, and later convicted of, murdering a restaurateur with a butcher knife.

In October of 1973, the petitioner in this case, Larry Thompson, fatally stabbed Richard Dean, the night manager of the Royal Castle Restaurant, following Thompson's aborted attempt to pilfer the cafe's cash register.[1] Realizing the probable consequences of his action, Thompson fled from Orlando, Florida, where the killing took place, to his parents' home in Indianapolis, where he remained for several days before surrendering to authorities. Law enforcement officials returned Thompson to Orlando and to Orange County's correctional facilities. Within the week following, Thompson was taken to an interview room for questioning by Officers Cunningham and Latham of the Orlando Police Department. After having been advised of his *Miranda* rights, Thompson signed a waiver card and announced his desire to make a statement but added that he first wanted to tell his story to an attorney. Officer Cunningham responded, essentially, that an attorney could not relate Thompson's story to the police, and Latham explained that an attorney would probably advise him to say nothing.[2] Thompson then proceeded with

---

**1.** Thompson admits the killing but claims self defense.

**2.** Examples of these exchanges are:
*Officer Cunningham* :
Q: Did he at any time request that the interview cease?
A: No, sir. The only thing he said was he would like to tell his attorney first and we told him he could tell us just as well and that his attorney would not be able to tell us what he said so he wanted to tell us himself.

&ast; &ast; &ast; &ast; &ast;

Q: Officer Cunningham, you indicated just a few seconds ago something about Mr. Thompson wanted to tell his attorney first?
A: Yes, sir.
Q: He indicated that to you?
A: Yes, sir.
Q: And then what did you tell him?
A: I advised him if he told you that he would not be able to tell us what happened.
Q: And then he went ahead and told you?
A: Yes, sir.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: But he did ask for an attorney? He wanted to tell an attorney first?

his statement, which the state later used at trial both to corroborate the testimony of an eyewitness and to impeach Thompson's own account of the stabbing. At the close of the evidence, the jury found Thompson guilty of first-degree murder.

Thompson's attorney twice challenged the admissibility of his client's incriminatory statement, first at a pretrial suppression hearing and again at the trial itself, through a motion to suppress offered immediately after the cross-examination of Officer Latham. The state trial court rejected both pleas to suppress, finding the evidence to show that Thompson had fully understood his *Miranda* rights and had voluntarily waived them. As the state judge observed, not only had Thompson signed a waiver card and expressed an understanding of his rights to the interrogating officers, but he also testified at the suppression hearing that he had understood his right to remain silent at the time of his interrogation. After the Supreme Court of Florida affirmed his conviction, *see Thompson v. State,* 328 So.2d 1 (1976), Thompson sought a writ of habeas corpus in federal district court, where a second judge heard testimony and concluded that petitioner had

voluntarily and intelligently waived his right to silence. Thompson appeals this last ruling here.

In reviewing factual determinations of state courts federal district courts grant habeas relief only upon convincing proof of error, *see* 28 U.S.C. § 2254(d) (1970); *Coursey v. Beto,* 455 F.2d 474 (5th Cir. 1972). Taking into consideration the limited scope of our factual review, on the record before us we could not say, absent the request for an attorney, that clear error was committed by any of the three courts that previously found a knowing, intelligent, and voluntary waiver. Although Thompson was only seventeen at the time of his interrogation, both state and federal district judges found him to be unusually articulate and a voracious reader;[3] and while Thompson claims not to have comprehended the waiver card's exact import,[4] it is undisputed that he understood his right to remain silent at the time of his interrogation. Moreover, by Thompson's own admission at the suppression hearing, he made his statement free of any threat or coercion.

The more troublesome issue in this case is whether Officers Cunningham and Latham violated the *per se* rule, established in *Mi-*

A: Yes, sir, and we advised him if he told an attorney first he would not be able to talk to us and tell us his side of the story.

\* \* \* \* \* \*

Q: So he signed the card and he told you he wanted to talk to an attorney first?

A: No, sir. This was some time afterward. The only thing he said was that he would like to tell his attorney first and we advised him that if he told his attorney, he could not tell his side of the story.

*Officer Latham:*

A: [W]e explained to him if he had anything that he would like to tell us that not only were we seeking evidence against him but anything he told us, if it would clear him, we would use it, also, and he said at that time that he had something to say that he would like to talk to his attorney first.

Q: Do you recall if you made any response to that statement by Mr. Thompson?

A: Yes, sir.

Q: What was your response, sir?

A: I told the Defendant that if he had anything that he wanted to tell us that if he waited and talked to an attorney, the first thing the attorney would tell him is not to say anything and that if he had anything that he thought we should know, that he should go ahead and tell us.

3. At both the suppression hearing and the trial itself, Thompson stated that he ordinarily reads from 50 to 100 books a year. In a similar case, *United States v. Barfield,* 507 F.2d 53 (5th Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975), we likewise upheld a lower court finding that a 14-year-old boy, possessed of "maturity beyond his years," had knowingly and intelligently waived his *Miranda* rights.

4. This point was raised for the first time at the habeas hearing. According to his testimony there, Thompson thought his signing of the card meant only that he understood his rights.

*randa*[5] and well recognized in this circuit,[6] that requires all custodial interrogation to cease once the suspect asks for an attorney. In resolving this question, we turn to the closely analogous case of *Nash v. Estelle,* 597 F.2d 513 [(5th Cir. 1979) (en banc)], in which we held that an equivocal request for counsel, one accompanied by an expressed willingness to talk, did not preclude all further conversation between the suspect and the interrogating officer. The specific facts of that case were these: Following his arrest on suspicion of murder, Nash was questioned by Assistant District Attorney Files, who began the interview by advising the accused of his rights and by explaining the waiver card, which Nash was having difficulty reading. During the explanation, Nash inquired whether he had to request an attorney in writing, and Files responded that he could do so orally. Nash then asked "to have [counsel] appointed," at 516, which prompted this statement from Files: "Okay. I had hoped that we might talk about this, but if you want a lawyer appointed, then we are going to have to stop right now." *Id.* at 516. At this juncture, Nash protested mildly that he wanted to talk, and, after Files had made certain of Nash's desire to do so without presence of counsel, he asked Nash to sign the waiver card and to give his statement. Observing the contradiction between Nash's expressed desires to have an attorney and to make a statement,[7] we affirmed the admission of his incriminating statement, holding that an interrogator may seek clarification of the accused's wishes in the instance of an equivocal request for counsel.

The facts of the instant case resemble those of *Nash* but with a crucial difference, which dictates a different result here. There the prosecutor's further inquiries after Nash's reference to having an attorney were limited to clarifying his equivocal request; and there we held, in a nutshell, that whenever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified. When and if it is clarified as a present desire for the assistance of legal counsel, *all* interrogation must cease until that is provided, just as in the case of an initial, unambiguous request for an attorney. And no statement taken

---

5. In *Miranda,* the Supreme Court laid down what Justice White was later to call a *"per se"* rule in *Michigan v. Mosley,* 423 U.S. 96, 109, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (White, J., concurring):

> If the individual [being interrogated] states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474, 86 S.Ct. at 1628. Nor can we ignore the Court's very recent decision in *Fare v. Michael C.,* · U.S. - ---, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). There, in the course of deciding that a request for the presence of a probation officer rather than a lawyer did not trigger *Miranda's* rule, the Court quoted the above passage from its decision in that case and re-emphasized repeatedly the "rigid" and ."*per se*" nature of the rule. Such references dot the opinion like raisins in a fruitcake. ·

6. In *United States v. Massey,* 550 F.2d 300, 307 (5th Cir. 1977), this circuit reaffirmed our earli-

er exposition of the *per se* rule quoted in the preceding footnote:

> Where there is a request for an attorney prior to any questioning, as in this case, a finding of knowing and intelligent waiver of the right to an attorney is impossible. . . . [T]he suspect has an absolute right to delay interrogation by requesting counsel. If such a request is disregarded and the questioning proceeds, any statement taken thereafter cannot be a result of waiver but must be presumed a product of compulsion, subtle or otherwise.

·*United States v. Priest,* 409 F.2d 491, 493 (5th Cir. 1969).

7. We realize that the desires to talk and to speak with an attorney are not necessarily inconsistent; as the Court in *Miranda* noted, 384 U.S. at 474, 86 S.Ct. 1602, a suspect may state that he is willing to talk with police only after conferring with counsel. On our facts, however, while Thompson's signing of the waiver card indicated a desire to give a statement without delay, his request for counsel came later.

after that request is made and before it is clarified as an effective waiver of the present assistance of counsel can clear the *Miranda* bar. Thus, by our holding in *Nash*, we avoid attributing a talismanic quality to the word "attorney" falling from a suspect's lips, while at the same time safeguarding his right to the assistance of counsel when he wants it and says so.

■ Decision of this case requires that we make explicit what seems clearly implicit in *Nash*, that the limited inquiry permissible after an equivocal request for legal counsel may not take the form of an argument between interrogators and suspect about whether having counsel would be in the suspect's best interests or not. Nor may it incorporate a presumption by the interrogator to tell the suspect what counsel's advice to him would be if he were present. Such measures are foreign to the purpose of clarification, which is not to persuade but to discern.

■ These observations decide our case. The officers' own words, quoted above at note 2, make plain that both persuasion and presumption took place here. Officer Cunningham's explanation of the consequences of the suspect's talking to counsel might have been innocuous, even proper, had it been correct. Certainly Mr. Files' explanation in Nash's case that he and the suspect could talk no further about his crime if he wanted counsel before doing so was proper. But even such explanations are perilous and, if given, must not be materially incorrect.

Here they were incorrect: it was simply not true, as Thompson was told, that "if he told his attorney he could not tell his side of the story." Such advice is clearly subject to the interpretation—indeed, it is its most natural one—that if Thompson told his attorney his version of the killing, he could never tell it to anyone else, could not even

testify in his own behalf should he later choose to do so. Its mildest possible reading is as what Officer Latham's later "advice" made explicit, that if Thompson consulted an attorney he would be told by him to say nothing more to the police. This may very well have been counsel's advice, though not necessarily so. The point is that counsel's advice about what is best for the suspect to do is for counsel, not the interrogator, to give. And it is for him to give after consultation with his client and after weighing where the suspect's best interests lie from the point of view of the suspect, not from that of a policeman—be he ever so well intentioned. Until this occurs, it is simply impossible to predict what counsel's advice would be; and even if it were, the right to advice of counsel surely is the right to advice from counsel, not from the interrogator.

It follows from the above that Thompson's incriminating statement, taken under the circumstances described and after he was misled into abandoning his equivocal request for counsel, was gotten in violation of *Miranda*. It was used, not merely for impeachment,[8] but in the government's case in chief. This was error, which can scarcely have been harmless.[9] His conviction cannot stand, therefore, and the writ must issue, conditioned that the state retry him or release him within a reasonable time. For the entry of such an order, the cause is

REVERSED AND REMANDED.

JONES, Circuit Judge, dissenting:

I think the judgment of the district court should be vacated and the cause remanded, with leave to take additional testimony, for further consideration in the light of *Nash v. Estelle.*

---

8. In most instances voluntary statements, even though taken in violation of *Miranda*, are admissible for impeachment purposes. *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

9. The harmless error rule applies to *Miranda* violations. *Null v. Wainwright,* 508 F.2d 340 (5th Cir. 1975), *cert. denied,* 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975).