**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Thomas CHERRY, Jr.,**
**Defendant-Appellant.**

**No. 83–1274.**

United States Court of Appeals,
Fifth Circuit.

May 25, 1984.

Robert Ramos, Asst. Federal Public Defender, El Paso, Tex., for defendant-appellant.

Edward C. Prado, U.S. Atty., Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., Stephen Trott, Asst. Atty. Gen., John De Pue, Atty., Dept. of Justice, Major Don DeCort, Criminal Law Div., Dept. of Army, Washington, D.C., for plaintiff-appellee.

Before BROWN and RANDALL, Circuit Judges, and HUNTER *, District Judge.

RANDALL, Circuit Judge:

Defendant-appellant James Thomas Cherry, Jr. was convicted of second degree murder and was sentenced to thirty years imprisonment. On appeal, Cherry contends that the district court erred in admitting his confession because it was obtained in violation of his fourth, fifth, and sixth amendment rights. We hold that Cherry's confession was inadmissible and therefore reverse.

*Factual and Procedural Background.*

On the morning of December 6, 1982, a dead man's body was found in the parking lot of an elementary school on the Biggs Field section of the military reservation at Fort Bliss, Texas. The cause of death was determined to be three gunshot wounds to the back and neck. The deceased was identified as Jesus Manriquez, a taxicab driver employed by the Checker Cab Company in El Paso, Texas. The Army's Criminal Investigations Detachment ("CID") and the FBI were notified.

The following morning, on December 7, 1982, the deceased's taxicab was found in downtown El Paso, Texas. During an FBI search of the cab, a military identification card and a Virginia driver's license in the name of U.S. Army Private James Thomas Cherry, Jr. were found on top of the sun visor.

At noon that day, FBI Agents Donald Graham and Gene Smith went to CID headquarters at Fort Bliss to see if the CID could help them locate Cherry. CID records revealed that Cherry was stationed on the base and Agents Graham and Smith, along with two CID agents, drove to Cherry's company area to locate him. They contacted Cherry's company commander, Captain John Spiridigliozzi, and told him they wanted to talk to Cherry. Captain Spiridigliozzi informed the agents that Cherry was due to report to battalion headquarters at 1:00 p.m. The FBI and CID agents then walked to the battalion commander's office to inform the battalion commander that they wanted to question Cherry.

At 1:00 p.m., Cherry reported to battalion headquarters where he was met by Sergeant Dave Bates, a member of his company. Sergeant Bates told Cherry that "there were some people in Battalion Headquarters that were looking for him." Record Vol. III at 119. Bates and Cherry then walked into battalion headquarters whereupon Agent Graham approached Cherry and identified himself as an FBI agent. Graham told Cherry that he wanted to ask Cherry some questions.[1] The

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. There was conflicting testimony regarding the manner in which Agent Graham informed Cherry that he wanted to ask him some questions.

FBI and CID agents then surrounded Cherry and walked him to a waiting FBI car. Record Vol. II at 39–40. Cherry was put in the back seat and flanked by two of the agents. *Id.* The four agents and Cherry then drove to CID headquarters where Cherry was to be questioned.

Once they arrived at CID headquarters, the FBI agents showed Cherry their badges and gave him his *Miranda* warnings via an advice of rights form. Cherry indicated that he understood his rights and signed the form. The two FBI agents then interrogated Cherry for about an hour, during which Cherry denied any involvement in the murder. Although no physical force had been used in bringing Cherry to CID headquarters for questioning, Agent Graham testified that Cherry was in custody and was not free to go. Record Vol. III at 44. Once this interrogation had concluded, the agents obtained Cherry's consent to search his barracks. The agents took Cherry to his barracks and conducted a search of his locker and personal belongings. During this search, the agents found a billfold in a trash can located in the latrine area of the barracks. Later that afternoon, the billfold was identified as the victim's. The search was completed at about 4:00 p.m. The agents then returned Cherry to CID headquarters, where they asked him to sign a written statement, which he did. At about this time, the FBI agents learned that the last location to which the victim's taxicab had been dispatched was Cherry's barracks. This dispatch had occurred at 6:17 p.m. on December 5, 1982, the night before the victim's body was found.

At approximately 5:30 p.m. on December 7th, the FBI agents told the CID what they had learned with regard to the investigation. The FBI and CID then discussed who would keep Cherry in custody. The FBI agents informed the CID that they wanted to have more evidence before seeking an arrest warrant. However, the FBI agents also told the CID that if the military was going to confine Cherry there was no need for the FBI to secure an arrest warrant until the FBI finished interviewing him the following day. There was conflicting testimony at trial whether military authorities decided to confine Cherry because they were asked to by the FBI, or whether they had independently decided to do so as a result of the evidence linking Cherry to the murder.[2] In any case, at approximately 7:00 p.m., Captain Spiridigliozzi signed a confinement order for Cherry, which charged him with murder under Article 118 of the Uniform Code of Military Justice, 10 U.S.C. § 918 (1982).

Cherry spent the night in a holding cell at the Military Police station, and was given some bedding and canned rations by members of his company. Early the next morning, December 8, 1982, Sergeant Carlton Crider arrived at the MP station to stand by while Cherry was in custody. Crider talked to Cherry and warned him: "[Regardless whether] you did anything or

---

At trial, Agent Graham testified that he told Cherry "We needed to talk to him and would appreciate it if he ... would accompany us to CID Headquarters." Record Vol. III at 39. However, Sergeant Bates, who was present when Graham first spoke to Cherry, testified that Graham said, "Are you Private Cherry, James Cherry?", and when Cherry said, "Yes," Graham said "We have some questions. Come with us." Record Vol. III at 119. When Cherry's counsel asked Bates whether "Come with us" was in the form of an order or a request, Bates replied, "It was an order." *Id.* at 120.

**2.** During cross examination, Agent Graham said, "It was our understanding ... that the military would confine Mr. Cherry anyway. So instead of us going for an arrest warrant at that point with the amount of probable cause we already had, there was no need until we finished interviewing the following day, to arrest Mr. Cherry. The military was going to confine him anyway." Record Vol. III at 49.

Captain Spiridigliozzi testified, however, that when he was contacted about the confinement order, "[T]he conversation, as best I remember it, [was] 'We don't have the authority to hold [Cherry] because we don't have enough evidence.'" Record Vol. III at 70. When Cherry's counsel asked Spiridigliozzi, "And then they asked you to sign that pretrial confinement order so that they could hold him on the murder investigation?", Spiridigliozzi replied, "Right, under [the Uniform Code of Military Justice], to put him in pretrial." *Id.* at 71.

you didn't, don't say anything. Don't say nothing to anyone. Just wait until you see a lawyer." Record Vol. III at 130–31. At 11:00 a.m., Sergeant Crider took Cherry over to the CID office for interrogation by FBI agents Chris Clark and Terry Youngblood.

Before interrogation began, Cherry was informed of his *Miranda* rights. He indicated that he understood these rights and signed a written waiver of these rights. Cherry then began to answer Clark's and Youngblood's questions regarding his activities the night that the murder occurred. The FBI agents told Cherry that there were certain inconsistencies in his story and apprised him of the evidence that had been uncovered connecting him to the murder.

After conveying this information to Cherry, the FBI agents noticed that he was beginning to break down,[3] and they sensed that they might be able to elicit a confession from him. Record Vol. III at 99–100. Agent Clark testified that at this point in the interrogation, "We asked [Cherry] if he didn't want to make a complete statement or story and if he did not want to tell us what the truth of the matter was. [Cherry] indicated that he did have some reservations. And he said, 'Maybe I should talk to an attorney before I make a further statement.'" *Id.* at 102. After Cherry said this, Agent Clark told him that the advice of counsel was one of Cherry's constitutional rights. Cherry then asked, "Why should I not get an attorney?" Clark answered by suggesting that an attorney would protect Cherry's rights and would most probably tell him to remain silent. *Id.* at 103. *See also* Government Exhibit 7 at 20. Although the FBI agents did not attempt to put Cherry in touch with an attorney, they did ask him if he wanted to be alone to consider whether to make any further statement. Record Vol. III at 107. Cherry then said, "I want to talk to the sergeant who brought me over." *Id.* at 108. Clark left the interrogation room to see if he could locate Sergeant Crider, who was posted at CID headquarters while Cherry was being interrogated. Clark was informed by CID personnel that Sergeant Crider had been replaced by Sergeant Curtis Brown, and Clark relayed this information to Cherry. *Id.* at 108–09.

When told this, Cherry said, "Well, then I want to speak to that sergeant." *Id.* at 109. Clark testified that he again left the room to see if he could locate Sergeant Brown, but was told that Sergeant Brown was no longer present.[1] *Id.* Clark then returned to the interrogation room, and a few seconds later Agent Graham entered the room. Graham told Agents Clark and Youngblood that one of Cherry's Army acquaintances had told him that he and other soldiers had recently seen Cherry in the possession of a .32 caliber automatic handgun. *Id.* at 110–11. The agents told Cherry this and asked him why he had denied having a gun.[5] Cherry responded,

---

**3.** The agents' report stated, "[T]he interviewing Agents observed that Cherry was becoming increasingly nervous, and at this stage of the interview his hands were shaking perceptibly." Gov. Exhibit 7 at 20.

**4.** Sergeant Brown, who had been posted at CID headquarters while Cherry was being interrogated, testified that he reported to relieve Sergeant Crider at 12:15 p.m., and that he told CID personnel that he was there to stand by with Cherry. Record Vol. III at 139–40. Brown also testified that he waited for Cherry until 4:15 p.m., and that no one had told him that Cherry wanted to speak to him. *Id.* at 140. Sergeant Crider testified that he and Cherry left the MP station for CID Headquarters at 11:00 a.m., *id.* at 131, but Crider did not testify as to the time he was relieved by Sergeant Brown.

**5.** During cross-examination, Clark testified:

    Q: [L]ooking, Mr. Clark, at the report of your investigation on page 21—well, let's go back to 20. "At this time FBI Special Agent Donald C. Graham came into the interview room and advised the interviewing agents that one of Cherry's Army acquaintances said to him that he had seen a .32 caliber automatic handgun in Cherry's possession recently. Several other soldiers who knew Cherry had seen him with the same gun." Okay?

    A: Right.

    Q: The next paragraph says, "Cherry was advised of this information." Does that mean then that Cherry did not overhear the agent make that announcement and that you then advised him of it, or what does it mean?

"Haven't you found the gun yet?", and told the agents where the gun was located in his barracks. *Id.* at 89, 111. The agents then asked Cherry to tell them the "true story," at which time Cherry began to cry. After a few minutes, Cherry regained his composure, and described to the agents the circumstances under which the murder occurred: The victim had picked up Cherry at the barracks and driven him to some night-clubs off the base. When Cherry found that these clubs were closed, he asked the victim to drive him back to the base. When they returned to Fort Bliss, the victim refused to give Cherry his change due and his military I.D. and driver's license, which the victim had asked Cherry for during the ride. Cherry then pulled his gun and demanded his change. The victim then grabbed for the gun, and Cherry pulled the trigger, shooting the driver once. Before Cherry could take his finger from the trigger, he fired two more shots that hit the driver. Record Vol. V at 345. After telling the agents this, Cherry began to cry uncontrollably and stated repeatedly that "he did not mean to kill the driver, that he was sorry, and that he just wanted to scare the driver." Government Exhibit 7 at 23. The interrogation ended at approximately 2:15 p.m., and Cherry was arrested.

Cherry was then transported to an El Paso County jail, but was not taken before a magistrate until 12:20 p.m. the next day, December 9, 1982. He was charged with second degree murder, of which he was later convicted.

*Cherry's Motion to Suppress the Confession.*

At trial, Cherry moved to suppress his confession for the following reasons: First, he argued that it was obtained as a result of a warrantless arrest without probable cause in violation of the fourth amendment. Cherry contended that he was "arrested" when he was taken into custody by FBI and CID agents at 1:00 p.m. on December 7, 1982, and was subjected to an hour of interrogation by FBI agents. He asserted that he remained under arrest and in the "custody" of civilian or military authorities until he confessed on December 8th, and that this custodial detention without probable cause was in violation of the Supreme Court's decision in *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).[6] Thus, he argued that his confession should be suppressed as a product of that illegal custody in accordance with *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[7]

Second, Cherry argued that his confession was inadmissible because it was obtained in violation of Fed.R.Crim.P. 5(a) and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Fed.R.Crim.P. 5(a) provides that "[A]ny person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate ...." In *Mallory*

---

A: It was a very small room, and he obviously overheard what was going on. But we did turn to him at that time and state that he had indicated to us earlier that he had not been in possession of a handgun.

Q: All right. And whether we label that statment [sic] of yours as a comment or a question, it was proposed to Mr. Cherry again in an effort to coax him to tell you the truth?

A: We desired an explanation as to why he had given us a different story.

Q: All right. Is that a "yes" answer to my question?

A: Yes.

Record Vol. III at 110–11.

**6.** In *Dunaway,* the Supreme Court held that an "arrest" resulted when the defendant was taken

from a neighbor's home to the police station for interrogation, and would have been physically restrained if he had refused to accompany the police. The court found that when such "arrests" occur without probable cause, they violate the fourth amendment and any inculpatory statements resulting from such an arrest cannot be used against the defendant.

**7.** In *Wong Sun,* the Supreme Court held that confessions resulting from unlawful custodial interrogation must be suppressed. In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Court held that in-custody statements that *stemmed from an illegal arrest* were not rendered admissible merely because the defendant had been given *Miranda* warnings prior to making such statements.

*v. United States, supra,* the Supreme Court reversed the defendant's conviction when the police, in violation of Rule 5(a), had waited nearly twenty-four hours before taking the defendant before a magistrate, and had elicited a confession in the meantime. Cherry contended that although he was arrested by civilian authorities at 1:00 p.m. on Tuesday, December 7th, 1982, he was not taken before a federal magistrate for two days. Thus, he argued that his confession should be suppressed because it was obtained during this delay.

Next, Cherry asserted that his confession was coerced as a result of the harsh jail conditions to which he was subjected the night before he was interrogated, and because Agents Clark and Youngblood refused to allow him to see the sergeant who was assigned to remain with Cherry during his interrogation.

Finally, Cherry argued that his confession was obtained in violation of his *Miranda* rights and the fifth and sixth amendments. Cherry's position was that although he had requested counsel, the FBI agents continued to question him and shortly thereafter elicited his confession.

The district court denied Cherry's motion to suppress the confession on all four grounds. The district court found that Cherry was not "arrested" at 1:00 p.m. on December 7, 1982. The court based this conclusion on the fact that Cherry was an enlisted member of the armed services, and was thus subject to the orders of his superior officers. Record Vol. I at 50. Thus, Cherry was "turned over" to FBI agents

for questioning. *Id.* The court held, therefore, that there was no custodial interrogation that would bar the defendant's confession under *Dunaway* and *Wong Sun.* Furthermore, since there was no "arrest" at 1:00 p.m. on December 7th, the district court held that Cherry's rights under Fed. R.Crim.P. 5(a) and *Mallory* were not violated. Record Vol. I at 50a. The district court also found that the defendant's confession was not coerced or obtained in violation of his *Miranda* rights. The court found that Cherry understood his *Miranda* rights and that he knowingly and voluntarily waived those rights. *Id.* Cherry reurges these contentions on appeal, and asserts that the district court erred in failing to suppress his confession on each of the four grounds.[8]

*Violation of Cherry's* Miranda *Rights.*

Our careful review of the record convinces us that Cherry's confession was obtained in violation of his *Miranda* rights; thus, it should not have been admitted at trial. Our conclusion in this respect renders it unnecessary for us to decide whether the confession should have been suppressed for the other reasons Cherry has advanced.[9]

■ In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court recognized that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.* at 458, 86

---

**8.** At trial, Cherry also moved to suppress prior inculpatory statements and certain items of physical evidence, which he claimed were the products of his illegal detention and interrogation. Record Vol. I at 77. The district court refused to suppress any of this evidence, *see* Record Vol. I at 46–52, but only the admission of the confession is raised on appeal.

**9.** Even though we decline to determine whether Cherry was "arrested" without probable cause at 1:00 p.m. on December 7, 1982, we note that the district court incorrectly assumed that Cherry could not be "arrested" because "he was subject to the orders of his superior officers." Record Vol. I at 50. In essence, the district court was

of the view that because Cherry was on active duty, he did not have the fourth amendment rights available to private citizens. In *United States v. Schneider,* 14 M.J. 189 (C.M.A.1982), the Court of Military Appeals noted that the Supreme Court's decisions in *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), are applicable to the military setting. In *Schneider,* the court held that the defendant was "arrested" within the meaning of *Dunaway* when he was brought to the Naval Investigative Service office "under guard in circumstances clearly indicating that he was a suspect." 14 M.J. at 193.

S.Ct. at 1619. Access to legal counsel was held essential to secure the fifth amendment privilege against self-incrimination. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1628. *Miranda* therefore created a "rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979).[10]

In this case, however, Cherry did not unambiguously indicate that he wanted to speak to an attorney before questioning continued. Instead, Cherry said, "Maybe I should talk to an attorney before I make a further statement," and, a few moments later, Cherry asked "Why should I not get an attorney?" Thus, while he indicated a desire to speak to counsel, the FBI agents were uncertain whether Cherry wanted to cease the interrogation until he actually did consult with an attorney. In *Nash v. Estelle*, 597 F.2d 513 (5th Cir.1979) (en banc), we established the procedure to be followed when a suspect expresses an equivocal request for counsel during questioning. If a suspect is indecisive in his request for counsel, law enforcement officials must cease the interrogation unless they ask the suspect further questions to clarify whether the suspect wants to consult with an attorney before continuing with the interrogation. However, such questioning is to be limited to this clarification and cannot be used as a means of eliciting any incriminating statements from the suspect relating to the subject matter of the interrogation. *Id.* at 517.

The rule we set forth in *Nash* was further clarified in *Thompson v. Wainwright*, 601 F.2d 768 (5th Cir.1979). There, the defendant Thompson was questioned by police officers in connection with a murder. After having been advised of his *Miranda* rights, Thompson indicated both a desire to speak to an attorney and a desire to make a statement. The interrogating officers told Thompson that an attorney could not relate Thompson's story to the police and that an attorney would probably advise him to remain silent. 601 F.2d at 769. Thompson then proceeded to make a statement, which was later used to incriminate him.

In determining that Thompson was entitled to habeas relief, we held that the limited inquiry permissible after an equivocal request for counsel may not take the form of an argument between the interrogators and the suspect about whether having counsel would be in the suspect's best interests. *Id.* at 772. We held also that the scope of this limited inquiry does not encompass a "presumption by the interrogator to tell the suspect what counsel's advice to him would be if he were present." *Id.* We found these measures to be a means used by the police to persuade Thompson to incriminate himself, and not to discern whether he wanted an attorney.

In explaining our decision, Judge Gee reemphasized the rule we developed in *Nash:*

> The facts of the instant case resemble those of *Nash* but with a crucial difference, which dictates a different result here. There the prosecutor's further inquiries after Nash's reference to having an attorney were limited to clarifying his equivocal request; and there we held, in

---

**10.** The significance of the invocation of the right to counsel is premised in part on a lawyer's "unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation." *Fare v. Michael C.*, 442 U.S. at 719, 99 S.Ct. at 2568, 2569. As Justice White noted in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975):

> [T]he reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he

indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism.

*Id.* at 110 n. 2 (White, J., concurring).

a nutshell, that whenever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified. When and if it is clarified as a present desire for the assistance of legal counsel, *all* interrogation must cease until that is provided, just as in the case of an initial, unambiguous request for an attorney. And no statement taken after that request is made and before it is clarified as an effective waiver of the present assistance of counsel can clear the *Miranda* bar.

*Id.* at 771–72 (emphasis in original).

■ Clearly, this rule was violated by the FBI agents in the instant case. After Cherry said, "Maybe I should speak to an attorney," asked why he should not get an attorney, and asked to see the sergeant on duty, the agents asked Cherry about the gun. After Cherry responded to this inquiry, the agents asked him to tell them how the murder had occurred. But before asking Cherry either of these questions, the agents failed to clarify whether Cherry wanted to resume interrogation without counsel. Cherry had not indicated in any manner that he had decided to dispense with legal advice before giving a statement, and the Supreme Court has warned us that in examining an alleged waiver of counsel, we are to "indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). More critical, however, is that after Cherry had made an equivocal request for counsel, Cherry did not volunteer his confession; rather, he responded to questions posed by his interrogators. In *Thompson* the questioners violated the rule in *Nash* by improperly using a discussion of the right to counsel as a means to elicit an incriminating

statement. Here, the agents exceeded the transgression in *Thompson* by asking Cherry about the murder itself to coax a confession from Cherry. Thus, the confession was inadmissible because, as Judge Gee instructed in *Thompson*, "[N]o statement taken after [an equivocal] request is made and before it is clarified as an effective waiver of the present assistance of counsel can clear the Miranda bar." 601 F.2d at 771–72 (emphasis in original). Thus, Cherry's confession should not have been admitted at trial.[11]

Recent Supreme Court precedent reinforces the rule we established in *Nash* and *Thompson*. In *Oregon v. Bradshaw*, —— U.S.˙——, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), Justice Rehnquist reiterated that once a suspect has expressed a desire for counsel, he " *'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'* " 103 S.Ct. at 2834 (quoting *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–1885, 68 L.Ed.2d 378 (1981)) (emphasis added by *Bradshaw* Court). Moreover, in *Solem v. Stumes*, —— U.S. ——, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), a majority of the Court emphasized that *Edwards* established a per se rule that, once a suspect has expressed a desire to speak to counsel, a waiver of the right to counsel, no matter how voluntary, can never be valid if made in response to further police questioning. *See* at ——–——, 104 S.Ct. at 1342–1344. *See also* at ——, 104 S.Ct. at 1346 (Powell, J., concurring). In denying Cherry's motion to suppress the confession, the district court found that after Agent Graham came into the interrogation room and told Agents Clark and Youngblood that Cherry had been seen with a gun, Cherry had initiated further conversation with the agents by asking, "Haven't you found the gun yet?"

---

**11.** In asserting that Cherry waived his right to counsel, the government argues that Cherry's remark, " 'Maybe I should contact an attorney....' was equivocal at best." Supplemental

Brief of Appellee at 20. However, the government fails utterly to address either *Nash* or *Thompson*, both of which bear directly on the issue of equivocal requests for counsel.

Record Vol. I at 49. Such a finding was clearly erroneous. The FBI report submitted by the agents clearly states that as soon as Agent Graham told the other agents that Cherry had been seen with a gun, "Cherry was advised of this information, and that he had earlier denied owning or possessing such a gun." Government Exhibit 7 at 21. Moreover, during cross-examination, Agent Clark admitted that it was the agents who first mentioned the gun to Cherry in an effort to coax him into giving them further information. Record Vol. III at 111.[12] Thus, it was not Cherry but the FBI agents who initiated conversation after Cherry had made an equivocal request for counsel, thereby eliciting the confession that ultimately led to his conviction.[13]

▮ The government argues that Cherry waived his *Miranda* rights by signing a written waiver of these rights before the interrogation began. A waiver of *Miranda* rights at the start of questioning does not prevent a suspect from effectively invoking these rights during the interrogation when the suspect believes it would be in his best interests to do so. In *Miranda, supra,* the Court held that if an individual indicates in any manner *during* questioning that he wants an attorney, the interrogation must cease until an attorney is present. 384 U.S. at 473–74, 86 S.Ct. at 1627–1628. In *Edwards, supra,* the defendant was informed of his *Miranda* rights prior to interrogation. The defendant stated that he understood these rights, and would submit to questioning. Later during the interrogation, the defendant told the police he wanted an attorney before proceeding. Although the police ceased interrogation after the defendant invoked this right, the police later returned to question him about the crime and elicited a confession. *Id.* at 478–79, 86 S.Ct. at 1629–1630. The Court reversed the defendant's conviction, holding that the confession was obtained in violation of the defendant's *Miranda* rights. *Id.* at 480, 86 S.Ct. at 1631. Finally, in *Thompson,* the defendant's equivocal request for counsel came *after* he had signed a waiver of his *Miranda* rights;[14] nevertheless, his conviction was reversed because the police did not limit their later questioning to clarification of this request.[15]

Because Cherry's confession was obtained in violation of the rule we established in *Nash* and *Thompson,* the district court erred in admitting it at trial. Thus, the judgment of the district court is REVERSED.

**12.** *See supra* note 5. Because Agent Graham admitted that they had told Cherry about the gun in an effort to elicit further information from him, it is unnecessary for us to determine whether telling Cherry about the gun was a form of interrogation under *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In *Innis,* the Supreme Court held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689 (footnotes omitted).

**13.** In its brief, the government also claimed that after Cherry said, "Maybe I should contact an attorney ....", it was Cherry who initiated further discussion with the agents, thus waiving his right to counsel. Supplemental Brief of Appellee at 20. As we have pointed out, it was the FBI agents, not Cherry, who initiated conversation following Cherry's equivocal expression of a desire to speak to counsel, and the conversation was not limited to clarification of this expression.

**14.** 601 F.2d at 771 n. 7.

**15.** The government also argues that Cherry's consent to search his barracks for the gun constituted a waiver of his *Miranda* rights prior to his confession. Supplemental Brief of Appellee at 21. Such a contention is without merit. Consent to search is not a waiver of the right to counsel. Moreover, this consent to search was the unlawful product of the government's inquiry regarding the gun.