**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles C. JARDINA,
Defendant-Appellant.**

**No. 84–4370.**

Summary Calendar

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1984.
Rehearing Denied Dec. 13, 1984.

Carolyn A. Ingraham (court-appointed), Lafayette, La., for defendant-appellant.

Joseph S. Cage, Jr., U.S. Atty., D.H. Perkins, Jr., Asst. U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before CLARK, Chief Judge, RUBIN, and GARWOOD, Circuit Judges.

CLARK, Chief Judge:

### I

Jardina appeals his conviction of passing counterfeit federal reserve notes in violation of 18 U.S.C. §§ 2, 371, and 472. Because the district court committed no error, we affirm.

### II

Jardina was arrested along with Richard Freire at approximately 3:00 a.m. on the morning of December 13, 1983. The arresting officer read both suspects their *Miranda* rights several times before bringing them to the St. Landry Parish Sheriff's Office. At the sheriff's office, Jardina was again read his *Miranda* rights several times, and he signed waiver of rights forms at 4:03 a.m., 4:47 a.m., and 10:19 a.m. on December 13. After signing one of the forms, Jardina consented to a search of his car, resulting in the discovery of twenty-

three counterfeit $100 federal reserve notes.

During the morning of December 13, the St. Landry Parish Sheriff's Office contacted the United States Secret Service in New Orleans. Two special agents arrived at the sheriff's office around 7:00 p.m. that evening. After speaking with Freire, the Secret Service interviewed Jardina around 1:30 a.m. on December 14. The agents orally advised Jardina of his *Miranda* rights, but did not have him sign a Waiver of Rights form.

Agent Heintz testified the following exchange then occurred:

Q: What did he respond to you after you ... orally advised him of his rights?

A: He stated he knew he didn't have to talk to me. And that he wasn't going to on certain matters. That he was interested in seeing what type of deal he could arrange between the government and his attorney.

The Court: What time was this, the first time?

The Witness: This was about 1:30 a.m., in the morning of December 14.

The Court: Okay. Is this your first contact?

The Witness: That's my first contact with Mr. Jardina.

Q: Who brought up the idea of a deal?

A: Mr. Jardina.

Agent Heintz testified that Jardina did not request an attorney, but rather stated that he already had an attorney in Texas. He also testified Jardina never requested that the questioning cease. Instead Jardina told the agents only that he would decide which questions to answer, exercising this option at such times as he chose. Jardina indicated that he wanted his attorney to work out a deal with the government whereby, in exchange for favorable sentencing consideration, Jardina would help the Secret Service infiltrate the counterfeiting market in Texas. The agents told him that no one other than the district attorney could make such a bargain, but that they would pass this information on.

The agents interviewed Jardina again at 11:45 a.m. on December 14. Jardina was read his rights, but did not sign a waiver form. The third contact between Jardina and the agents was five days later, at 8:55 a.m. on December 19, at which time Jardina signed a Waiver of Rights form. Jardina made inculpatory statements during all three of these interviews.

At trial, the court initially excluded the statements made at the first interview at 1:30 a.m., but allowed the other two. Later, he reversed his ruling over Jardina's objection, allowing the introduction of all three inculpatory statements. The court also allowed introduction of two counterfeit notes that were allegedly passed at the Fast Lane and Union 76 Truck Stops. Finally, the court admitted other counterfeit notes and evidence concerning the counterfeit passing activities of Jardina and Freire in Texas. Jardina alleges error based on each of these items of evidence.

### III

Jardina claims the inculpatory statements he made to the Secret Service should have been excluded from evidence, because after he requested an attorney the officers continued to question him.

■ Jardina is correct in asserting that once an accused requests an attorney, all interrogation must cease until the attorney is present. *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). Jardina also relies on *United States v. Cherry*, 733 F.2d 1124 (5th Cir. 1984) for the proposition that if an accused even equivocally invokes the right to an attorney, future questioning of the suspect must be limited to clarifying whether the person wants to consult with an attorney. Further interrogation "cannot be used as a means of eliciting any incriminating statements from the suspect relating to the subject matter of the interrogation." *Id.* at 1130. *See also Nash v. Estelle*, 597 F.2d 513, 517–18 (5th Cir.1979) (en banc), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). Jardina contends that

he indecisively invoked his right to an attorney when he suggested that through his lawyer he wanted to work out a deal with the government.

*Cherry* does not support Jardina's case. Cherry's remarks included the statement, "Maybe I should talk to an attorney before I make a further statement," followed a few moments later by: "Why should I not get an attorney?" *Id.* at 1130.

In contrast to Cherry's statements clearly evincing equivocation about a present desire to have the advice of counsel, Jardina never asked that counsel be present at the ongoing questioning. Indeed, the words he spoke clearly indicated that he wished his attorney to work out a cooperative deal with the government in the future. Jardina stated without the slightest ambiguity that he would then and there answer some questions but not others. The word "attorney" has no talismanic qualities. A defendant does not invoke his right to counsel any time the word falls from his lips. *See Nash, supra,* at 519; *Thompson v. Wainwright,* 601 F.2d 768, 772 (5th Cir.1979). Jardina's statements and actions did not invoke any present right to counsel.

The district court did not err in admitting the statements Jardina made during his three interviews by the Secret Service.

In reviewing a trial court's ruling on a motion to suppress based on live testimony at a suppression hearing, the trial court's purely factual findings must be accepted unless clearly erroneous, or influenced by an incorrect view of the law, and the evidence must be viewed in the light most favorable to the party prevailing below, except where such a view is either not consistent with the trial court's findings or is clearly erroneous considering the evidence as a whole.

*United States v. Maldonado,* 735 F.2d 809, 814 (5th Cir.1984) (citations omitted).

The judge based his rulings upon the testimony that Jardina had received three *Miranda* warnings from the St. Landry Parish investigators before the interviews with the Secret Service. While acknowl-

edging that the interrogations were separate, the court was convinced that Jardina was aware of his rights. Agent Heintz again orally informed Jardina of his rights prior to their discussions. Finally, the court found that Jardina selectively waived his right to remain silent by indicating that he would respond to some questions and not to others, and by exercising his voluntarily created option.

In *United States v. Young,* 527 F.2d 1334 (5th Cir.1976), the defendant had been advised of his rights three times, had indicated that he understood them, and had executed two written waivers. No threats or promises were used to secure Young's statements. Our Circuit affirmed Young's conviction because the trial court's finding of voluntariness was not clearly erroneous. *Id.* at 1335. Likewise, we hold that the court's decision in the case at bar was sufficiently supported by the evidence and is not clearly erroneous.

### IV

Jardina next contends that the statements he made to the Secret Service should be excluded because he was detained in the St. Landry Parish Sheriffs Office for six days before being brought before a magistrate. The federal agents were aware that it was likely federal charges would be brought against Jardina. Thus he claims, he should have had his initial appearance within hours, not days, of his apprehension. Federal Rule of Criminal Procedure 5(a) requires that "any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate ...." The United States Supreme Court has held that a delay of twenty-four hours could be unreasonable, and excluded a confession obtained during the interim. *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

Jardina may not rely on *Mallory,* however. The initial detention was in state custody. Jardina was in federal custody only two to three hours before he was

taken before a magistrate. "Absent collusion between state and federal authorities, only the period of federal detention is relevant to a claim of unnecessary delay. *United States v. Brown,* 459 F.2d 319, 324 (5th Cir.1971)." *Young, supra,* at 1335 n. 2. *Young* held that a period of three and one-half hours was not an unreasonable delay. *Id.* Because Jardina has neither alleged nor proven that collusion existed between the state and federal authorities, we hold that no unreasonable delay occurred, and his statements were admissible.

## V

Jardina next claims that the court erred in allowing the introduction at trial of two counterfeit $100 bills allegedly passed at the Union 76 and Fast Lane Truck Stops in Lafayette, Louisiana. He claims that the evidence was insufficient to establish that he was the person who passed the notes because there was no evidence linking him to their passing at either location. Specifically, he contends that the government needed the testimony of the cashiers from both truck stops who took the bills from Freire. Otherwise, the evidence could not be traced to these transactions, so its admission lacked probative value and was unduly prejudicial.

Jardina relies on *United States v. Christy,* 444 F.2d 448, 450 (6th Cir.), *cert. denied,* 404 U.S. 949, 92 S.Ct. 293, 30 L.Ed.2d 266 (1971), where the court required the cashier's testimony to link the defendant with the passing of a counterfeit bill. In *Christy,* the testimony was contradictory as to whether Christy or his codefendant cashed the bill. Each accused the other of doing so. The cashier and another store clerk testified that the codefendant cashed the bill, not Christy. Moreover, these employees did not mark the bill or identify it at trial. Instead, it was introduced by the store manager, who initialed the bill when he discovered it was counterfeit.

The cashier had given the bill to the manager's wife who later gave it to the manager. The wife never testified at trial.

The court held the government failed to show how the manager "got custody of the bill or of its relation to the offense charged." *Id.* at 450. The Sixth Circuit held the bill should have been excluded from evidence, not because of lack of proof that Christy was the person who passed the bill, but because of discrepancies in the proof of the chain of custody of the counterfeit bill *after* the crime had been committed. *Id.* The bill, therefore, was not properly authenticated.

In citing *Christy,* Jardina thus seems to inject a separate issue and to confuse two questions: first, whether there was sufficient evidence to link Jardina with the bills introduced in evidence, a question solely of laying a foundation, and second, whether there was sufficient evidence to establish that the bills passed were the same ones introduced at the trial, a question of authentication or chain of custody. *See* Fed. R.Evid. 901.

■ As to the first point, *Christy* provides no authority because that was not the issue. Here, the government introduced reliable proof that the tendered bills were those which had been passed by Freire. Evaluating the admissibility of evidence is largely a matter within the discretion of the trial court. *United States v. Clayton,* 643 F.2d 1071, 1074 (5th Cir.1981); *Georgia Southern & Florida Railway Co. v. Perry,* 326 F.2d 921, 924 (5th Cir.1964); *Moore v. Louisville & Nashville Railroad Co.,* 223 F.2d 214, 216 (5th Cir.1955).

▪■ The evidence presented at Jardina's trial clearly met the required showing when considered in a light most favorable to the government, as *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), requires. Freire testified that he cashed $100 bills obtained from Jardina at the Union 76 and Fast Lane Truck Stops on the evening in question. From this evidence a jury could reasonably conclude that Jardina cashed a counterfeit bill at the Union 76. Similarly, the evidence was sufficient to establish that Jardi-

na cashed a counterfeit bill at the Fast Lane.

◼ The second point raises a question of identification of the exhibits offered at trial as being the same ones passed by Jardina. When confronted with evidence of questionable origin, the court should admit the evidence if a prima facie showing of authenticity is made. The sponsor need not present proof beyond a reasonable doubt. Fed.R.Evid. 901 governs the authentication of evidence, and its principles apply also to establishing the chain of custody of an exhibit. *See Ballou v. Henri Studios, Inc.,* 656 F.2d 1147, 1150 (5th Cir. 1981); *United States v. Henderson,* 588 F.2d 157, 160 (5th Cir.), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794 (1979). The Advisory Committee's Note to this rule states that in determining whether to admit evidence of disputed authenticity, the court should use the same procedures set forth in Rule 104(a), which discusses relevancy conditional on fact. The Advisory Committee's Notes to Rule 104(b) require the judge to make a preliminary determination whether a jury could reasonably conclude the disputed condition is fulfilled. If so, then the evidence is admissible.

Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document is authentic. *United States v. Natale,* 526 F.2d 1160, 1173 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976); *United States v. King,* 472 F.2d 1, 7 (9th Cir.), *cert. denied sub nom. Arias v. United States,* 414 U.S. 864, 94 S.Ct. 174, 38 L.Ed.2d 84 (1973); *United States v. Addonizio,* 451 F.2d 49, 69 (3d Cir.), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *United States v. Tellier,* 255 F.2d 441, 448 (2d Cir.1958); 5 J. Wigmore, Evidence, § 2135 (3d ed. 1940). *See also*

Fed.R.Evid. 901(a) (not in effect at time of trial).

*United States v. Goichman,* 547 F.2d 778, 784 (3d Cir.1976).

◼ There was sufficient evidence of identification of the bills and of the chain of custody of the bills to warrant their admission. With regard to the passing of the counterfeit instrument at the Union 76 Truck Stop, the manager testified that the bill was received at the gift department, and that after he discovered it while making a bank deposit, he turned the bill over to the Lafayette Parish Sheriff's Office. The bill is identical in appearance to the counterfeit bills which were recovered from Jardina's car, including a distinctive burgundy coloration. In addition, Freire testified that he purchased a package of socks and sunglasses with this bill. The socks, which were found in Jardina's car at the time of arrest, were positively identified at trial as coming from the Union 76 Truck Stop in Lafayette.

◼ Similarly, an employee of the bank where Fast Lane made deposits testified that she found a counterfeit $100 bill in the Fast Lane deposit at her bank. The bill not only has the same coloration and general appearance as the other counterfeit bills, it has the identical serial number as twenty of the twenty-one counterfeit bills found in Jardina's car. The evidence further shows that only one counterfeit bill was found in the Fast Lane deposits for the day in question.

Although Jardina argues that neither of these chains is complete, "the mere possibility of a break in the chain does not render the physical evidence inadmissible, but raises the question of the weight to be accorded by the jury to the sufficiency of the proof of a chain of custody." *United States v. White,* 569 F.2d 263, 266 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). A reasonable jury could find that the government established the chains of custody with sufficient proof. We therefore find no error in the admission of the exhibits into evidence on the grounds that the bills were not proper-

ly authenticated. *See* Fed.R.Evid. 901 and 104(b).

## VI

Jardina finally argues that testimony about the counterfeit note passing activities of Jardina and Freire in Texas should not have been admitted under the standard of Fed.R.Evid. 404(b) and *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), since the indictment did not charge Jardina with any illegal activities in Texas. To introduce evidence of extrinsic crimes, wrongs, or acts, *Beechum* requires a two step analysis:

> First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403.

*Id.* at 911. *See also United States v. Wilson,* 732 F.2d 404, 409 (5th Cir.1984).

The government has satisfied the first prong by offering the evidence to establish Jardina's intent, modus operandi, and lack of mistake in passing counterfeit money. The testimony clearly had a relevance beyond mere character evidence. The more difficult question, however, is posed by the second prong. "The determination of probative value vs. unfair prejudice 'calls for a commonsense assessment of all the circumstances surrounding the extrinsic offense.'" *Wilson, supra,* at 409, *quoting Beechum, supra,* at 914.

 "Whether the extrinsic offense is sufficiently similar in its physical elements so that its probative value is not substantially outweighed by its undue prejudice is a matter within sound discretion of the trial judge." *Beechum, supra,* at 915. The court need not be convinced that the defendant committed the extrinsic offense, nor is the government required to produce clear and convincing evidence of such acts. *Id.* at 913. The court should allow the introduction of the evidence unless "the jury could not reasonably find the preliminary fact to exist. 21 Wright & Graham, Federal Practice and Procedure: Evidence § 5054, at 269 (1977)." *Id.*

Freire testified about the acts of Jardina and Freire in Texas, and the jury could reasonably have believed his testimony. Furthermore, the activities in Texas closely resembled those in Louisiana for which Jardina was charged. "In measuring the probative value of the evidence, the judge should consider the overall similarity of the extrinsic and charged offense.... [T]he probative value of the extrinsic offense correlates positively with its likeness to the offense charged." *Beechum, supra,* at 915. We cannot say the district court abused its discretion in determining that the probity of this proof outweighed its prejudice.

The court, therefore, did not err in allowing the introduction of the Texas activities, the counterfeit bills passed at the two truck stops, or the statements Jardina made to the Secret Service. We must resolve reasonable inferences and credibility choices presented by the proof in support of the jury's verdict. *United States v. Lerma,* 657 F.2d 786, 789 (5th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 463 (1982); *United States v. Henderson,* 588 F.2d 157, 160–61 (5th Cir. 1979), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794 (1979). Because a reasonable trier of fact could have found beyond a reasonable doubt that Jardina passed counterfeit federal reserve notes, *see United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983), the judgment of the district court is

AFFIRMED.